UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:24-cr-226-3 (BAH) |
| : | |
| TREVON PALMER, : | |
|     a.k.a. "Rocky," : | |
| : | |
| Defendant. : | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Trevon Palmer (hereinafter, the "Defendant").[1] On September 12, 2025, the Defendant pled guilty to a Superseding Information (ECF No. 321), charging him with 1) Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi), and 846 (Count One), and 2) Aggravated Assault While Armed and Aiding and Abetting, in violation of 22 D.C. Code §§ 404.01, 4502, and 1805 (Count Two). For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 242 months of incarceration (specifically, 146 months on Count One and 96 months on Count Two, respectively, to run consecutively to each other), to be followed by 60 months of Supervised Release.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

As the Court is aware, the Defendant's guilty plea is the result of his deliberate participation in a violent, armed group of drug dealers known as the "21st and Vietnam" crew. Members of the crew, some of whom identify the area they frequent as the "I Block," operated in a residential area

---

[1] Sentencing is scheduled for December 11, 2025.

in Northeast Washington, D.C., specifically the area colloquially known as "21st and Maryland." This refers to the area surrounding the intersection of 21st Street and Maryland Avenue, NE, Washington, D.C., which consists mainly of low-rise apartments and row homes, and includes the 1900 block of I Street, NE, Washington, D.C. (I Street, NE is one block south of and parallel to Maryland Avenue, NE. 19th Street, NE is the next street to the west of and parallel to 21st Street, NE.) In addition to being home to many D.C. residents, the area is also home to schools, playgrounds, recreational centers, and multiple businesses.

Within this D.C neighborhood alone, this crew has been responsible for the distribution of significant quantities of multiple types of narcotics, including crack cocaine, fentanyl, methamphetamine, phencyclidine ("PCP"), and n-n-dimethylpentylone ("boot"). Moreover, in a disturbing illustration of the link between drug trafficking and violence, 21st and Vietnam crew members have also been involved in multiple instances of firearms possession and shootings. These instances include two shootings charged in connection with this case: the March 7, 2024, incident in which Co-Defendant Charles Manson opened fire on a passerby walking his dog near the crew's open-air drug market; and the April 19, 2024, drive-by shooting, committed by the Defendant and Co-Defendant Briyon Shuford, which wounded four people and terrorized others.

A.      **Narcotics Trafficking**

Although they certainly did not constrain their drug activities and violence to one exclusive area, the crew members, including the Defendant, frequently used an apartment building, located at 1919 I Street, NE, Washington, D.C., as a base of operations for their criminal conduct. Specifically, members of the crew built their open-air drug market around the apartment building and its surroundings, selling drugs outside in the front and the rear, as well as the in first-floor hallway of the apartment building. These sales occurred on a near daily basis between at least June

2023, when the investigation began, and May 2024, when they were arrested. Indeed, the Defendant and other crew members were so emboldened by their perceived invincibility that when one of the apartments became vacant (Apartment 101), they did not hesitate to begin using it for their own nefarious purposes.

Nor was the Defendant a peripheral figure in the conspiracy. On the contrary, the Defendant was a key player in the group, regularly working with his co-conspirators to distribute narcotics in and around the building and further their operations. Moreover, at least based on controlled buys, the Defendant was one of the most prolific sellers of drugs. Indeed, in roughly just four months—between late November 2023 and March 2024, the Defendant sold drugs to law enforcement and/or confidential informants on 12 separate occasions. During this limited time period alone, and setting aside any narcotics sales that were not part of this investigation, he sold approximately 300 grams of fentanyl. Nor were his sales limited to just one substance: in addition to fentanyl, the Defendant sold crack cocaine and methamphetamine.

      **B.**      **April 19, 2024, Shooting**

As this Court is aware, there is a strong correlation between drugs and guns, and this case is emblematic of the ways in which drug dealing in conjunction is tied with violence. A chilling example of this is the April 19, 2024, shooting, in which the Defendant and Co-Defendant Shuford shot *four people* in the area of a convenience store on Mt. Olivet Road, NE, Washington, D.C.

Specifically on the morning of April 19, 2024, at around 10:50 a.m., Shuford arrived at the apartment building located at 1919 I Street, NE, where he met up with the Defendant. They departed in Shuford's vehicle before exchanging it for a stolen Infiniti sedan. After getting into the stolen vehicle, which Shuford was driving, they headed to the 1200 block of Mt. Olivet Road, NE, Washington, D.C., and went hunting for members of a rival crew.

After finding what they believed to be appropriate targets, he shot rifle rounds toward the parking lot of the Circle 7 Food and Grocery Mart without regard for innocent bystanders or passing cars. Screenshots from surveillance footage, showing a muzzle flash from the sunroof, are below:





Ultimately, the Defendant and Shuford accomplished what they set out to do, shooting four individuals, who sustained injuries to the hips, thighs, and/or buttocks that required medical attention, and terrorizing still others who ran for their lives once gunfire erupted. Having completed their objective, they ditched the stolen vehicle and attempted to cover their tracks by separating briefly, walking in different directions before rejoining at a nearby home. After they were reunited, the Defendant and Shuford traveled together back to 1919 I Street, NE, via Uber, apparently unphased by the devastation they left behind.

Later that day, the Defendant and Co-Defendant Bailey had a conversation in the crew's stash apartment. During that conversation, Bailey said something sounding like, "y'all parked it up here?", presumably referring to the car that the Defendant and Shuford used in the shooting, which had been stolen. The Defendant responded, "nah, uptown." Bailey replied, "so we only got one more car then," suggesting that their supply of vehicles for use in criminal activity was dwindling.

## II. LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

### III. GUIDELINES CALCULATION

#### A. Total Offense Level

As detailed in the Final Presentence Report (the "PSR") (ECF No. 333) and the plea agreement (ECF No. 322), with respect to Count One, the base offense level for Count One is 32, pursuant to U.S.S.G. § 2D1.1(c)(4). Two points are added pursuant to U.S.S.G. § 2D1.1(b)(1) because a firearm was possessed in the course of the conspiracy. After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count One is 31. *See* PSR ¶¶ 101-11.

The Guidelines for Count Two are governed by the D.C. Voluntary Sentencing Guidelines, and the offense is in Offense Severity Group 4. *See id.* ¶ 113.

#### B. Criminal History Category

For purposes of the U.S. Sentencing Guidelines, the Defendant has a total of six criminal history points, which places him in Criminal History Category III. *See id.* ¶ 130. For purposes of the D.C. Voluntary Sentencing Guidelines, the Defendant has a total of 2.25 points, which places him in Criminal History Category C. *See id.* ¶ 126.

#### C. Sentencing Guideline Range

For Count One, which carries a ten-year mandatory minimum term of imprisonment, a final offense level of 31 and Criminal History Category III results in a Guidelines Range of 135 to 168 months of incarceration, 60 months of Supervised Release, and a fine range of $30,000 to $10,000,000. *See id.* ¶¶ 195, 203, 221. For Count Two, which carries a five-year mandatory term of imprisonment, the D.C. Sentencing Gudelines provide a range of 72 to 144 months of incarceration, and the D.C. Code requires the imposition of 60 months of Supervised Release. *Id.* ¶¶ 196, 202. Neither the U.S. Sentencing Guidelines nor the D.C. Sentencing Guidelines

"addresses whether sentences for federal offenses should run consecutively or concurrently to the D.C. Code offenses when a defendant is convicted of both federal and D.C. Code offenses." *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016). Consequently, this Court has discretion in deciding whether to run the sentences for each offense consecutively, concurrently, or partially concurrently. *Id.* As argued below, the Court should run them consecutively.

IV.     **ARGUMENT**

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 242 months of incarceration (specifically, 146 months on Count One and 96 months on Count Two to run consecutively to each other), followed by 60 months of Supervised Release. For the reasons detailed below, the United States respectfully submits that this request, which reflects a sentence within the bottom third of the Guidelines Range on each count, is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

        **1.**     **The Nature, Circumstances, and Seriousness of the Offense**

The circumstances of this case—including this Defendant's specific conduct—involve significant narcotics trafficking of multiple types of narcotics accompanied by gun violence. While each—standing alone—pose incredible risk to the public and cause grave societal harm, it is difficult to imagine a more lethal combination.

According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl.[2] Startingly, "two milligrams of fentanyl can

---

[2] https://www.dea.gov/resources/facts-about-fentanyl.

8

be lethal depending on a person's body size, tolerance and past usage." *Id.* The lethality of fentanyl is reflected in nationwide statistics: roughly 73,690 people in this country died of drug overdoses in the 12-month period ending in April 2025. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 7, 2025).[3] Of these deaths, roughly 42,233 (or about 57 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2023, nearly 47,000 people in the United States died of firearms. *See* John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (March 5, 2025)).[4] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2023, Washington, D.C., had an opioid overdose death rate of 49.6 people per 100,000—second among all the states and D.C. only to West Virginia. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2023 timeframe).[5]

This Court is already aware that the damage caused by the Defendant and his co-conspirators extended well beyond the cost of addiction in terms of human suffering. The actions of the Defendant and his co-conspirators brought terror, instability, and danger to an entire neighborhood community and beyond. As the United States has previously noted, it is difficult to adequately assess the impact upon the residents of 1919 I Street, NE, or the entire neighborhood, which bore witness to their emboldened lawlessness caused by the brazen actions of the Defendant and his co-conspirators.

But the Defendant engaged in the singularly most culpable act in this investigation: a midday drive-by mass shooting in which four people were shot and many more were put at risk

---

[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[4] https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/.
[5] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

and terrorized. And this was far from an impulsive act. Instead, the facts of the shooting lead to the inference that it required a fair amount of planning: the Defendant and Shuford met up, armed themselves, retrieved a stolen vehicle, engaged in the shooting, dumped the stolen vehicle, and tried to avoid detection by splitting up before reuniting. Indeed, this event is emblematic of the danger posed by the Defendant and his willingness to take advantage of other people to suit his own ends, whether it involves peddling poison for financial benefit or unleashing gunfire from a moving vehicle in broad daylight, with no regard for human life. The depravity of the Defendant's conduct demands the Government's requested sentence.

### 2. The Defendant's History and Characteristics

The instant case is not the Defendant's first adult involvement with the criminal justice system. He was convicted in 2015 in Virginia for Grand Larceny after he essentially burglarized a house and stole several thousand dollars' worth of items. *See* PSR ¶ 118. In 2020, he was convicted of FIP after he possessed a firearm at a gun range. *See id.* ¶ 119. Then, in 2022, he was convicted in two separate cases of misdemeanor drug offenses. *See id.* ¶¶ 120-21. In addition, the conduct referenced in paragraphs 114 to 117 of the PSR is significant.

The Defendant's propensity for criminality and misbehavior is highlighted by the fact that he does not obey the law and follow the rules when he should be on his best behavior. He failed to comply with his supervision in numerous respects following his 2015 and 2020 convictions. *See id.* ¶¶ 118-19. It appears that he committed his FIP while on supervision for his Grand Larceny conviction, as his probation in the Grand Larceny case was revoked after his FIP arrest and conviction. *See id.* He also committed his two misdemeanor drug offenses while on Supervised Release in his FIP case. *See id.* ¶¶ 119-21.

Moreover, he now faces charges in D.C. Superior Court case 2025-CMD-014975 for

allegedly threatening and assaulting correctional officers at the D.C. Jail *after* he pleaded guilty in this case and while awaiting sentencing—that is, when he should have been on his best behavior in the hopes of lessening his sentence. Specifically, on November 5, 2025, according to the narrative prepared in connection with the arrest, a correctional officer (CO-1) ordered the Defendant's cellmate to go to his cell and had to place the cellmate into the cell. The Defendant then allegedly threatened CO-1, saying that the Defendant would knock out CO-1. Another officer (CO-2) tried to place the Defendant into handcuffs, and the Defendant allegedly punched CO-2 in the head, causing him to fall to the ground:



The Defendant ran from officers and ran up a set of stairs; he turned around and allegedly kicked a third officer (CO-3), causing him to fall down the stairs:

11



In sum, the Defendant has chosen to repeatedly engage in unlawful conduct and has been unwilling or unable to refrain from such conduct, even during times when he was incarcerated or on supervision. His unwillingness or inability to constrain his conduct to comport with the law while pending sentencing in this case paints a stark picture of his disregard for the law. This history, and what it suggests about the danger he poses to the community, justifies the Government's requested sentence.

### 3. The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The United States respectfully submits that the need to deter not only the Defendant, but also others, weighs in favor of the recommended sentence. As the United States has noted before, the need for deterrence is particularly significant here, where the Defendant's conduct (along with those of his co-conspirators) impacted many: the entire neighborhood they operated in, the residents of the apartment building they took over, and the drug

users to whom they sold (as well as those users' families and friends), and the victims of their gun violence..

In a case such as this, where the Defendant's actions were felt by many and visible to yet more, and where the Defendant has long been engaged in criminal activity, a substantial prison sentence is the best measure of deterrence available to the Court, and the United States submits that a sentence of 242 months is appropriate. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects both the seriousness and dangerousness of the Defendant's conduct in this case. This is particularly true where, as here, the Defendant has yet to be deterred. With respect to general deterrence, this recommended sentence seeks to promote respect for the law and the safety of the community by hopefully serving as a deterrent to brazen conduct such as that perpetrated by the Defendant and his co-conspirators in this case.

####    4.    Incapacitation

The United States's recommended sentence is also justified to protect the public from the Defendant, who has a demonstrated pattern of offending and committing acts of violence. The Defendant's choices to sell drugs, including fentanyl, and to engage in gun violence, going so far as to participate in a broad daylight drive by shooting, demonstrate that an extended period of incarceration is necessary to protect others from his actions and disregard for the law.

####    5.    The Need to Avoid Unwarranted Disparities

The Government's requested sentence, which reflects the bottom third of the Guidelines Range on each count—146 months and 96 months, respectively—to run consecutively to each other, for an aggregate of 242 months imprisonment, is also appropriate in light of the sentences given to other Defendants.

*First*, while the Court has discretion in whether to run the sentences consecutively or concurrently, *Knight*, 824 F.3d at 1111; *see also* D.C. Sentencing Guidelines Ch. 7 (explaining that a court has discretion to decide whether to sentence a crime of violence, such as Aggravated Assault While Armed, consecutively or concurrently to a non-violent offense), the Court should run the sentences consecutively. This would create parity with other Defendants. Two Defendants in this case, Briyon Shuford and Charles Manson, pleaded guilty to Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 846; Possession of a Firearm During and in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and a D.C. Code offense arising from a shooting: Briyon Shuford and Charles Manson. Both of them pleaded guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Shuford's Guideline Range on his federal offenses was estimated to be an aggregate 101 to 111 months (41 to 51 months for Drug Conspiracy and 60 months for the § 924(c), which is required to run consecutively to any other offense), and his Guideline Range on the D.C. Code Aggravated Assault While Armed was effectively 60 to 120 months. *See* ECF No. 85 at 4-6. His C-plea range—which this Court accepted—was calculated by adding 60 months from the D.C. Code shooting to the federal Guideline Range, which resulted in an aggregate range of 161 to 171 months. *Id.* The Court ultimately sentenced him to 101 months on his federal counts and 60 months on his D.C. Code count to run consecutively, for a total sentence of 161 months. *See* ECF No. 134 at 3. Similarly, Manson's Guideline Range on his federal offenses was estimated to be 130-147 months (70 to 87 months for Drug Conspiracy and 60 months for the § 924(c)), and his Guideline Range on the D.C. Code Assault with a Dangerous Weapon was 30 to 72 months. *See* ECF No. 196 at 4-6. His C-plea range of 160 to 219 months was calculated by adding the D.C. Code range to the federal range. *See id.* at 6. The Court ultimately sentenced him to 130 months on his federal

14

counts and 40 months on his D.C. Code count to run consecutively, for a total sentence of 170 months. *See* ECF No. 290 at 3. For parity with Shuford and Manson, this Court should also run the Defendant's sentence on his D.C. Code offense consecutively to his sentence on his federal offense.

*Second*, the Defendant should receive a significantly higher sentence than both Manson and Shuford. Shuford received a sentence of 161 months for Drug Conspiracy, § 924(c), and the same shooting that the Defendant engaged in. But Shuford pleaded guilty far earlier in the case; in fact, the first to indicate his desire to plead guilty, and he did so before he had even been charged in relation to the drive-by shooting. Moreover, Shuford had lower criminal history, and he was far less culpable in the drug conspiracy—indeed, unlike the Defendant, who personally sold significant quantities of fentanyl to an undercover officer on multiple occasions, there were no controlled buys at all from Shuford.

Manson received a sentence of 170 months for Drug Conspiracy, § 924(c), and a shooting. While Manson was in the same Criminal History Category as the Defendant, he was accountable for less drugs than the Defendant. Significantly, the nature of Manson's gun violence was far different: although Manson also opened fire across a street in broad daylight, no one was injured. Indeed, the shooting was prompted by Manson's verbal altercation with the victim, and appeared designed to frighten the victim, rather than to strike him. By contrast, the Defendant took part in a cold and calculated drive by shooting, one that required planning and preparation, which ultimately injured four people. Plus, while Shuford and Manson were both convicted under § 924(c) because firearms and narcotics were recovered from their residences, the Defendant's plain involvement with firearms and narcotics means that his lack of § 924(c) conviction does not render him appreciably less culpable than Manson and Shuford. Rather, he is significantly more

15

culpable. Finally, the Defendant was the last charged individual apprehended on May 15, 2024, when he was arrested in a parking lot and under circumstances that suggested he was preparing to flee—consistent with statements made by a co-conspirator that he may have warned the Defendant of imminent law enforcement action.

*Third*, while a plurality of Defendants in this case have been sentenced at the bottom of their respective Guidelines range, Manson was sentenced at about the bottom 18 percent of his range, and Bailey—who was also involved with firearms—was sentenced at the bottom 25 percent. The Defendant should receive a higher sentence within his range than these two, as he is more culpable overall and committed a more significant act of violence. Further, his disciplinary history at the jail—in which he received five infractions for threats and assaults, including the assaults described above, *see* PSR ¶ 60—warrant a sentence well above the bottom of his Guidelines Range.[6]

## V.     FORFEITURE

As the parties agreed to in the plea agreement, *see* ECF No. 322 ¶ 12, the United States seeks a forfeiture order (attached hereto) for two firearm magazines and $2,600 in cash seized from the Defendant's residence on May 15, 2024, and a money judgment for $29,125. The money judgment is based on the money paid to the Defendant for the controlled buys set forth in the Statement of Offense (less the $2,600 in cash seized) as follows: $75 for the November 30, 2023, sale, in which the Defendant obtained at least some of the drugs from a co-conspirator; $75 for the December 4, 2023, sale, in which the Defendant obtained at least some of the drugs from a co-conspirator; $300 for the December 12, 2023, sale; $300 for the December 21, 2023, sale; $300

---

[6] Notably, Defendant Van Robinson was found with about five grams of fentanyl at the D.C. Jail. Defendants Damien Jenkins and Shuford allegedly got into a fight at the jail, and Jenkins allegedly stabbed Shuford. Neither of these incidents involved assaults of multiple corrections officers.

16

for the January 11, 2024, sale; $600 for the January 18, 2024, sale; $2,500 for the January 25, 2024, sale; $5,000 for the February 2, 2024, sale; $75 for the February 13, 2024, sale; $7,500 for the February 15, 2024, sale; $7,500 for the February 29, 2024, sale; and $7,500 for the March 20, 2024, sale.

## VI. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to 242 months of imprisonment, followed by 60 months of Supervised Release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated in 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: */s/ Solomon Eppel*
SOLOMON EPPEL
DC Bar No. 1046323
ANDREA DUVALL
AR Bar No. 2013114
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530