**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

      **v.**                                      **24-cr-226 (BAH0**

**TREVON PALMER**

### SENTENCING MEMO REQUESTING CLEMENCY

When I was fourteen years old my sister and I started volunteering at Cheltenham Childrens' Home in Philadelphia.  This was a shelter for children, who had been  removed from their homes by the Court,   pending placement in foster care.  This was where I first encountered children who cringed, and bent their bodies away from a caress or a hug.

I met similarly vulnerable babies and children in New York City at Childrens' Center, where I worked as a counselor from 1969 to 1971.  Terrified, traumatized children. Afraid to be touched. Only love and patience could help. Only a long term, loving home could retore their humanity.

From 1971 until 1975 I was one of two women who worked at the Pennsylvania Youth Development Center, outside of Philadelphia. I was a counselor to court adjudicated delinquent boys, aged 15 to 19.  Traumatized adolescents. Pretending they were tough guys.  Only with love, treatment for their physiological and neurological problems, addressing environmental trauma and remedial education, could they be helped.   Only with an appropriate diagnosis, and thereafter correct treatment, could a successful return to the community occur.

And then, only if you could locate an appropriate guardian, or a home, school or mental health placement. Our mission was to deter future crime by the boys and to try to treat their emotional wounds. To educate them.  To find placements for them.  To prepare them to return to the community. It was always difficult. It was almost always unsuccessful, because adequate community resources were rarely available.

1

In 1975 I enrolled at Antioch School of Law hoping that with a law degree and better credentials I could produce better outcomes and opportunities for this underserved community. In 1979 I began to work in Washington, D.C. as a CJA Panel attorney.

I have worked with vulnerable and traumatized human beings my entire life. Our children have been failed by parents, by schools, by social workers and by our communities. As a nation, we do not protect our children. We fail to appropriately educate them, to love them, or to promote their human development. As a society, if we do not take care of our children, if we forsake them, they are unlikely and unable to thrive.

As a nation, we are responsible for these injured and flawed human beings. And when they fail, what is our response? We put them into cages. How is that working out for us? We have the highest percentage of human beings incarcerated of any country.

Since the launch of America's failed "war on drugs", we have had an enormous increase in the number of prisons to house all our flawed human beings. The majority of the jailed are young black men.

## A Brief History of Civil Rights in the United States: The War on Drugs and Mass Incarceration

This guide focuses on the civil rights that various groups have fought for within the United States.



- **The War on Drugs and Mass Incarceration**

No discussion of civil rights for blacks can be complete without addressing the issue of mass incarceration. While this complicated issue has roots as far back as the end of the Civil War, it was exacerbated by the policies put in place by President Reagan and Congress when they declared a war on drugs. Those policies were maintained by Bush and intensified by the crime bill passed in 1994 by President Clinton. It was only in George W. Bush's second term that the sentencing disparity between crack cocaine and powder cocaine was finally addressed by the Supreme Court. Even still, a disparity in sentencing between the two drugs remains, despite the fact that they have been determined to be almost the same substance.

Misguided drug laws and draconian sentencing requirements, especially pertaining to crack cocaine, have produced profoundly unequal outcomes for communities of color. The results have decimated minority families - black men in particular have been victims of these policies. Although rates of drug use and selling are comparable across racial and ethnic lines, blacks and Latinos are far more likely to be criminalized for drug law violations than whites. Although minorities use and sell drugs at a similar rate as whites, the proportion of those incarcerated in state prisons for drug offenses who are black or Latino is 57 percent.



## Notable Supreme Court Cases:

- *United States v. Booker*, 543 U.S. 220 (2005) - this case held that the sentencing guidelines, which had been mandatory, were instead advisory and that courts needed to look to the history and characteristics of defendants when determining sentence lengths.

- *Kimbrough v. United States*, 552 U.S. 85 (2007) - this case took the holding in Booker and applied it specifically to crack cocaine versus powder cocaine sentencing guidelines. There was a huge discrepancy in the sentencing of crack cocaine dealers/users versus dealers/users of powder cocaine (the 100-to-1 ratio) and this case confirmed judges were free to use their discretion when sentencing defendants in crack cocaine cases.



Source: Bonczar, T. (2003). *Prevalence of Imprisonment in the U.S. Population: 1974–2001*. Washington, D.C.: Bureau of Justice Statistics

## Selected Library Resources:

- Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, HV9950 .A437 2010
- Elizabeth Kai Hinton, *From the War on Poverty to the War on Crime: The Making of Mass Incarceration in America*, HV9950 .H56 2016 (available from the Founders Library Auxiliary Stacks), also available as an ebook
- Linda F. Williams, *The Constraint of Race: Legacies of White Skin Privilege in America*, E185.61 .W7365 2003
- Doris Marie Provine, *Unequal Under Law: Race in the War on Drugs*, KF4755 .P76 2007
- Mary E. Patillo et al., *Imprisoning America: the Social Effects of Mass Incarceration*, HV8705 .I455 2004
- Mona Pauline Lynch, *Hard Bargains: the Coercive Power of Drug Laws in Federal Court*, KF3890 .L96 2016
- Alexandra Natapoff, *Punishment Without Crime: How Our Massive Misdemeanor System Traps the Innocent and Makes America More Unequal*, KF9300 .N38 2018
- Jonathan Birnbaum and Clarence Taylor, *Civil Rights since 1787: A Reader on the Black Struggle*, E184.6 .C595 2000

The "war on drugs" has resulted in an enormous increase in the numbers of young, African Americans incarcerated.  Despite all the studies that show mandatory sentences do not work and that longer, harsher sentences are not a deterrent to crime, Congress and state legislatures continue to promote policies that research and statistics prove do not reduce crime.

# Race, Mass Incarceration, and the Disastrous War on Drugs

May 10, 2021

This essay is part of the Brennan Center's series examining the punitive excess that has come to define America's criminal legal system.

" I have a long view of the criminal punishment system, having been in the trenches for nearly 40 years as an activist, lobbyist, legislative counsel, legal scholar, and policy analyst. So I was hardly surprised when Richard Nixon's domestic policy advisor John Ehrlichman revealed in a 1994 interview that the "War on Drugs" had begun as a racially motivated crusade to criminalize Blacks and the anti-war left.

"We knew we couldn't make it illegal to be either against the war or blacks, but by getting the public to associate the hippies with marijuana and blacks with heroin and then criminalizing them both heavily, we could disrupt those communities. We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night in the evening news. Did we know we were lying about the drugs? Of course we did," Ehrlichman said.

Before the War on Drugs, explicit discrimination — and for decades, overtly racist lynching — were the primary weapons in the subjugation of Black people. Then mass incarceration, the gradual progeny of a number of congressional bills, made it so much easier. Most notably, the 1984 Comprehensive Crime Control and Safe Streets Act eliminated parole in the federal system, resulting in an upsurge of geriatric prisoners. Then the 1986 Anti-Drug Abuse Act established mandatory minimum sentencing schemes, including the infamous 100-to-1 ratio between crack and powder cocaine sentences. Its expansion in 1988 added an overly broad definition of conspiracy to the mix. These laws flooded the federal system with people convicted of low-level and nonviolent drug offenses.

During the early 1990s, I walked the halls of Congress lobbying against various omnibus crime bills, which culminated in the granddaddy of them all — the Violent Crime Control and Safe Streets Act of 1994. This bill featured the largest expansion of the federal death penalty in

modern times, the gutting of habeas corpus, the evisceration of the exclusionary rule, the trying of 13-year-olds as adults, and 100,000 new cops on the streets, which led to an explosion in racial profiling. It also included the elimination of Pell educational grants for prisoners, the implementation of the federal three strikes law, and monetary incentives to states to enact "truth-in-sentencing" laws, which subsidized an astronomical rise in prison construction across the country, lengthened the amount of time to be served, and solidified a mentality of meanness.

The prevailing narrative at the time was "tough on crime." It was a narrative that caused then-candidate Bill Clinton to leave his presidential campaign trail to oversee the execution of a mentally challenged man in Arkansas. It was the same narrative that brought about the crack–powder cocaine disparity, supported the transfer of youth to adult courts, and popularized the myth of the Black child as "superpredator."

With the proliferation of mandatory minimum sentences during the height of the War on Drugs, unnecessarily lengthy prison terms were robotically meted out with callous abandon. Shockingly severe sentences for drug offenses — 10, 20, 30 years, even life imprisonment — hardly raised an eyebrow. Traumatizing sentences that snatched parents from children and loved ones, destabilizing families and communities, became commonplace.

Such punishments should offend our society's standard of decency. Why haven't they? Most flabbergasting to me was the Supreme Court's 1991 decision asserting that mandatory life imprisonment for a first-time drug offense was not cruel and unusual punishment. The rationale was ludicrous. The Court actually held that although the punishment was cruel, it was not unusual.

The twisted logic reminded me of another Supreme Court case that had been decided a few years earlier. There, the Court allowed the execution of a man — despite overwhelming evidence of racial bias — because of fear that the floodgates would be opened to racial challenges in other aspects of criminal sentencing as well. Essentially, this ruling found that lengthy sentences in such cases are cruel, but they are usual. In other words, systemic racism exists, but because that is the norm, it is therefore constitutional.

In many instances, laws today are facially neutral and do not appear to discriminate intentionally. But the disparate treatment often built into our legal institutions allows discrimination to occur without the need of overt action. These laws look fair but nevertheless have a racially discriminatory impact that is structurally embedded in many police departments, prosecutor's offices, and courtrooms.

Since the late 1980s, a combination of federal law enforcement policies, prosecutorial practices, and legislation resulted in Black people being disproportionately arrested, convicted, and imprisoned for possession and distribution of crack cocaine. Five grams of crack cocaine — the weight of a couple packs of sugar — was, for sentencing purposes, deemed the equivalent of 500 grams of powder cocaine; both resulted in the same five-year sentence. Although household surveys from the National Institute for Drug Abuse have revealed larger numbers of documented white crack cocaine users, the overwhelming number of arrests nonetheless came from Black communities who were disproportionately impacted by the facially neutral, yet illogically harsh, crack penalties.

For the system to be just, the public must be confident that at every stage of the process — from the initial investigation of crimes by police to the prosecution and punishment of those crimes — people in like circumstances are treated the same. Today, however, as yesterday, the criminal legal system strays far from that ideal, causing African Americans to often question, is it justice or "just-us?"

Fortunately, the tough-on-crime chorus that arose from the War on Drugs is disappearing and a new narrative is developing. I sensed the beginning of this with the 2008 Second Chance Reentry bill and 2010 Fair Sentencing Act, which reduced the disparity between crack and powder cocaine. I smiled when the 2012 Supreme Court ruling in _Miller v. Alabama_ came out, which held that mandatory life sentences without parole for children violated the Eighth Amendment's prohibition against cruel and unusual punishment. In 2013, I was delighted when Attorney General Eric Holder announced his Smart on Crime policies, focusing federal prosecutions on large-scale drug traffickers rather than bit players. The following year, I applauded President Obama's executive clemency initiative to provide relief for many people serving inordinately lengthy mandatory-minimum sentences. Despite its failure to become law, I celebrated the Sentencing Reform and Corrections Act of 2015, a carefully negotiated bipartisan bill passed out of the Senate Judiciary Committee in 2015; a few years later some of its provisions were incorporated as part of the 2018 First Step Act. All of these reforms would have been unthinkable when I first embarked on criminal legal system reform.

But all of this is not enough. We have experienced nearly five decades of destructive mass incarceration. There must be an end to the racist policies and severe sentences the War on Drugs brought us. We must not be content with piecemeal reform and baby-step progress.

Indeed, rather than steps, it is time for leaps and bounds. End all mandatory minimum sentences and invest in a health-centered approach to substance use disorders. Demand a second-look process with the presumption of release for those serving life-without-parole drug sentences.

7

Make sentences retroactive where laws have changed. Support categorical clemencies to rectify past injustices.

It is time for bold action. We must not be satisfied with the norm, but work toward institutionalizing the demand for a standard of decency that values transformative change."

*Nkechi Taifa is president of The Taifa Group LLC, convener of the Justice Roundtable, and author of the memoir,* Black Power, Black Lawyer: My Audacious Quest for Justice.

**General Deterrence**

Multiple studies at research universities, think tanks, NACDL, and the CDC speak to effective policies to reduce Opioid deaths, to address crime, to produce better societal outcomes. To make the United States a better and more forgiving nation. To approach drug abuse and crime intelligently, and to base policy on empirical evidence of how to reduce both. Courts are left with outdated policies and Mandatory Minimum sentences that do not encompass better policies to reduce community risk and to deter crime.

The following scientific studies demonstrate that longer, stiffer sentences do not deter crime, nor do longer sentences reduce crime:

1.     "A 2021 large analysis of 116 studies showed that spending time behind bars either didn't affect a person's future crime risk or slightly increased it, compared with people who received a sentence that didn't involve imprisonment. That finding held true for men and women, young people and adults, people who served time in county jails and those housed in state prisons." Jamie Santa Cruz, *Rethinking Prison as a Deterrent to Future Crime* (July 2022), https://daily.jstor.org/rethinking-prison-as-a-deterrent-to-future-crime

2.     "The certainty of being caught is a vastly more powerful deterrent than the punishment." National Institute of Justice, *Five Things About Deterrence* (May 2016), http://www.nij.gov/five-things/pages/deterrence.aspx.

"Sending an individual convicted of a crime to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crimes. Prisons actually may have the opposite effect. Inmates learn

more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment." id.

3.  "[E]vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. The evidence in support of certainty's deterrent effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent Thus, this revised conclusion about the deterrent effect of punishment certainly should not be construed as implying that policies mandating severe legal consequences help. "The certainty of being caught is a vastly more powerful deterrent than the punishment." National Institute of Justice, *Five Things About Deterrence* (May 2016), http://www.nij.gov/five-things/pages/deterrence.aspx.

"Sending an individual convicted of a crime to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crimes. Prisons actually may have the opposite effect. Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment." *Id.*

4.  "[T]here is little evidence that increases in the length of already long prison sentence yield general deterrent effects that are sufficiently large to justify their social and economic costs." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

"Lengthy prison sentences cannot be justified on a deterrence-based crime prevention basis." Id. at 202

"[E]vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. The evidence in support of certainty's deterrent effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension

is the more effective deterrent Thus, this revised conclusion about the
deterrent effect of punishment certainly should not be construed as
implying that policies mandating severe legal consequences have been demonstrated to achieve
deterrent effects." Id. at 201-202

5.      "Empirical studies have shown that longer sentences have minimal or no benefit
on whether offenders or potential offenders commit crimes. The National Academy
of Sciences (NAS) concluded that 'insufficient evidence exists to justify predicating
policy choices on the general assumption that harsher punishments yield
measurable deterrent effects.' NAS pointed out that all leading surveys of the
deterrence research have reached the same conclusion: that 'potential offenders
may not accurately perceive, and may vastly underestimate, those risks and
punishments' associated with committing a crime. Some researchers suggest that
incarceration has even less of a deterrent effect for violent crimes. Unlike property
crimes, which offer a financial incentive and can replace or supplement legal
income, violent crimes are often crimes of passion, not premeditated. Therefore,
severe terms of incarceration may not affect an offender's immediate decision to
engage in criminal behavior." Brennan Center for Justice, *What Caused the Crime
Decline?* 26 (Feb. 2015),
https://www.brennancenter.org/sites/default/files/analysis/Crime_rate_report_web.pdf.

6.      Incapacitating a low-level drug seller prevents little, if any, drug selling; the Annotated
Bibliography for Federal Non-Capital Sentencing. The crime is simply committed by someone else."
USSC, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal
Justice System is Achieving the Goals of Sentencing Reform 131(2004)*

7.      "For several categories of offenders, an incapacitation strategy of crime prevention
can misfire because most or all of those sent to prison are rapidly replaced in the
criminal networks in which they participate. Street-level drug trafficking is the
paradigm case. . .. Drug policy research has. . . shown consistently that arrested
dealers are quickly replaced by new recruits Arrests and imprisonments of
easily replaceable offenders create illicit 'opportunities' for others." National
Research Council, *The Growth of Incarceration in the United States: Exploring
Causes and Consequences* 146 (Jeremy Travis et al. eds., 2014),
http://nap.edu/catalog.php?record_id=18613. *See also id*. at 88 ("Most drug policy
analysts agree that ... imprisoning individual drug dealers  is ineffective.  "For several categories
of offenders, an incapacitation strategy of crime prevention can misfire because most or all of
those sent to prison are rapidly replaced in the criminal networks in which they participate.

Street-level drug trafficking is the paradigm case. . .. Drug policy research has. . . shown consistently that arrested dealers are quickly replaced by new recruits Arrests and imprisonments of easily replaceable offenders create illicit 'opportunities' for others." National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 146 (Jeremy Travis et al. eds., 2014), http://nap.edu/catalog.php?record_id=18613. *See also id*. at 88

8.    "Increasing the severity of punishment does little to deter crime ...... More severe punishments do not 'chasten' individuals convicted of crimes, and prisons may exacerbate recidivism." Nat'l Instit. of Justice, *Five Things About Deterrence,* https://nij.gov/five-things/pages/deterrence.aspx

9.    "Incarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect of increasing incarceration on the crime rate has been essentially zero. Increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century. Increased incarceration has had no effect on the drop in violent crime in the past 24 years. In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall." Brennan Center for Justice, *What Caused the Crime Decline?* 15 (Feb. 2015), https://www.brennancenter.org/our-work/research-reports/what-caused-crime-decline.Annotated Bibliography for Federal Non-Capital Sentencing

10.    The federal system is out of step with most states; most states have worked to reduce reliance on incarceration. "[B]etween 2007 and 2013, many states made research-driven policy changes to control prison growth, reduce recidivism, and contain costs. While the federal imprisonment rate continued to rise during that period, the state rate declined." Pew Charitable Trusts, Growth in Federal Prison System Exceeds States' 1 (Jan. 2015), https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2015/01/growth-in-federal-prison-system-exceeds-states.

**18 USC § 3553  Sentencing Considerations**

The sentencing mandates of 18 USC §3553 and the foregoing scientific research on crime and punishment, inform our request that the Court limit the  sentence to 120 months [as permitted by the plea agreement] to be followed by a period of Supervised Release,  during which supportive services can be provided.   Such a sentence would be sufficient, but not greater than necessary to serve justice.

Trevon is caught in the race based "war on drugs" and the destructive  effects Mandatory Minimum Sentences have had on the African American family. As Judge Gleason states in his memorandum opinion in United States v. Diaz 11 cr-821,  weight based sentences are not based on empirical evidence. "Mandatory minimum sentences in drug trafficking cases distort the sentencing process and mandate unjust sentences".


**The Nature and Circumstances of the Offense**

In evaluating the offense conduct, there is no question but that trafficking Fentanyl is bad. People die from overdoses. However, the ten year mandatory sentence for drug sales, in this case, is more than sufficient punishment. The twenty year sentence the Government is requesting, even in consideration of the D.C. assault charge, is draconian.  Trevon is not drug king pin, nor was the drive-by, albeit dangerous and potentially deadly,  the equivalent of drug cartel violence.

I understand the initial law enforcement theory is that mandatory sentences would force small fish to "snitch" on ever larger fish, enabling law enforcement to catch the biggest fish. In all the years of my criminal defense work since the implementation of the Sentencing Guidelines, this rarely,  if ever, comes to fruition.  In the meantime, families are destroyed by long sentences which beyond temporary incapacitation,  serve no purpose. Mandatory sentences have not to decreased crime.  Nor do the penalties act as a  cause for general or specific deterrence

In 2023 the FBI began an investigation of a group of young men in or around the 2100 block of Maryland Avenue Northeast.  Each defendant was a street level, hand to hand, drug dealer. The men were not rich nor making  lots of money from their drug sales.

Trevon did not even own a car.  He did not have an apartment. He was couch surfing. He couldn't hold a job during Covid. In 2023 he was still unemployed. He had three children to support. Trevon, like the other street level defendants in the Bassil case, was not a drug king pin.

Law enforcement could have been arrested Trevon in November 2023, but the low drug quantity he was responsible for, would not secure a mandatory minimum sentence. Better to let the game play on, until a year later, when sufficient drugs had been sold for each defendant to reach a higher drug weight to secure a mandatory minimum sentence.

The monies spent on this investigation was not justified by prosecution of this low level group. Pole cameras. FBI surveillance. A "pretend" apartment/stash house, wired for sound and stocked with hidden cameras, gave law enforcement the tools to capture real time evidence. Undercover drug purchases by civilians and undercover law enforcement put money into the group. Over $29,000 was paid to Palmer alone for drugs. CI's were paid additional monies for each buy in which they participated.

The supposed basis for these enormous expenditures in FBI funds and manpower, is to give law enforcement the ability to go up the crime ladder, to find and prosecute the major drug distributers. How often has the Court seen that outcome?

Over the years, counsel has conferred with multiple defense attorneys and prosecutors. Except in rare cases, we have not seen the arrest of a drug kingpin. This policy may look good on paper. There are statistics showing multiple arrests and lengthy sentences. There is, however, no evidence this policy improves life in the afflicted communities or reduces crime.

**History and Characteristics of Trevon Palmer**

The Government plea offer, permits us to request the Court grant a downward variance on Count One to the mandatory minimum sentence of 120 months. The plea further permits us to request the Court order the sentence in Count Two, for the D.C. assault charge, to run concurrent to the sentence of 120 months.

In consideration of the, neurological and mental health issues which Trevon has suffered since birth, and his traumatic social history, we request the Court grant our request. Whether it is called a downward variance, judicial clemency or just mercy, in consideration of Trevon's personal history and characteristics, a sentence of 120 months is sufficient. A ten year sentence would achieve justice and show compassion by the Court.

According to Condalero Huntley, his mother, Trevon had a difficult birth. The umbilical cord was wrapped around his neck. Her understanding is the strangulation resulted in a loss of oxygen to his brain causing permanent neurological damage. As a small child he was diagnosed with ADHD and Behavior Disorder. He could not function in a classroom. He was provided an

Individual education Plan at age seven and placed in Special Education programs for Emotional and Behavior Disorders.

His older brother, Philip, was his main source of love and comfort. His father was in prison. His mother suffered from substance abuse and eating disorders. Philip was the "parent" who provided security. On October 5, 2008. when Trevon was twelve, his brother was murdered. Trevon saw the mangled body of his brother.

I met Trevon Palmer in May 2024. After two visits to Trevon in the D.C. jail it was easy to recognize he was a traumatized young man. I was unsure how to best represent him before the Court.    In October 2024, I engaged Dr. Travis Flower, a neuro psychologist, to evaluate Trevon. After interviewing Trevon and completing a forensic evaluation, Dr. Flower made the following conclusions:

" Mr. Palmer's development has been impacted by a number of traumatic or adverse experiences. These factors have included the absence of his father, the tragic death of his brother, and the absence of other positive male attachment figures. He also suffered cognitive problems related to a reading disorder, inconsistently treated ADHD, and possibly a head injury; these cognitive issues contributed to severe difficulties coping with the school environment, and ultimately required a transfer to a long-term residential educational setting. He was also exposed to drugs and alcohol at an early age, and later escalated to more serious addictions.

Mr. Palmer was previously diagnosed with attention deficit hyperactivity disorder. ADHD is characterized by persistent and severe problems with attention and/or hyperactivity. The disorder typically results in numerous conduct problems, and may lead to more serious antisocial behavior by adolescence. Impulsivity is typical, and shows up in things like impatience, being unable to wait one's turn, restlessness in sedentary activities, acting before thinking, inappropriate comments, and general disruptiveness. Problems resulting from ADHD commonly persist into adulthood. ADHD increases the individual's risk for developing problems with impulsive behavior, mood disorder, and problems with interpersonal functioning. It appears very likely that his ADHD and Reading Disorder contributed significantly to negative feelings toward school, a negative image of himself, and poor expectations of his future potential. Additionally, children with ADHD can also have greater difficulty coping with stressful or traumatic factors in the environment, compared with other children in such environments. Mr. Palmer's ADHD, in other words, would be expected to cause him to be less resilient in the face of stressors such as the traumatic loss of his brother, and more likely to externalize his emotional distress through various problematic behaviors. It is unclear whether his cognitive problems were exacerbated by a head injury during adolescence, but his mother previously reported that she observed his behavioral problems worsened after this injury.

Around age 12, Mr. Palmer reportedly saw the corpse of his brother Philip immediately after Philip had been murdered. He reportedly experienced symptoms of posttraumatic stress disorder (PTSD) following this experience, including re-experiencing traumatic memories via intrusive thoughts and nightmares, heightened arousal and anxiety, disturbance in mood (also reflected in his behavioral problems), and avoidance of reminders of the trauma. He may also have met criteria for a major depressive episode following the murder. Mr. Palmer and his mother both noted that his behavioral problems worsened after this experience. In addition to suffering acute trauma symptoms, Mr. Palmer lost the only male attachment figure or role model he had in the family. It appears likely that the absence of positive role models contributed to his bonding with peers who engaged in substance abuse and other negative behaviors during his adolescence. The information available does not indicate that he currently meets full criteria for PTSD. Psychological testing indicated he may downplay his problems, however, and it appears likely that his substance use has served to mask and numb his emotional distress.

Mr. Palmer reported a significant history of substance use and addiction. He meets criteria for Cocaine Use Disorder and Opioid Use Disorder. It appears likely he has also met criteria for Alcohol Use Disorder and Cannabis Use Disorder but has psychologically downplayed the difficulties associated with those substances in his life. These diagnoses refer to a problematic pattern of substance use resulting in various areas of impairment. The individual may experience tolerance, and require greater amounts of the substance to experience the same effect. They can experience cravings for the substance, as well as difficulty controlling, limiting, or reducing their use. They can experience different symptoms of withdrawal when unable to obtain the substance. They may continue use despite negative effects on their psychological or physical health, or despite negative effects on their relationships and responsibilities. Judgment is commonly impaired during acute intoxication. Even when not under the influence of the substance, the individual can show poor judgment, impulse-control, and insight into their problem, particularly after their habits of thought have been distorted as they become more addicted. "

**Criminal History**

The pages in the Presentence Report dedicated to Criminal History could be re titled  the defendant's numerous contacts with police, most resulting with Nolle Prosequi or dismissals. The adult convictions in the report are as follows:

¶ 118 a burglary in Virginia, when he was eighteen years old. Which is the basis for-

¶ 119 FIP -- based on his posting on Instagram videos of him shooting  guns at a firing range in Maryland.

¶ 120 Att. PWID Marijuana also. based on a video post monitored by the MPD.

¶ 121 Poss. of less than 10 gr, Marijuana.  We do not have any knowledge of this charge.

A Criminal History Score of 6 seriously overstates his criminal history.


**APPROPRIATE SENTENCE PURSUANT TO 18 USC § 3553**

The minimum sentence based on the offense conduct and the Plea Agreement  is 120 months.  The question for the Court now, is this sentence sufficient, but not greater than necessary to reflect the nature and circumstances of the offense and the history and characteristics of Trevon Palmer? Neither Trevor, his family nor the community will benefit from such a long mandatory sentence.  A longer sentence would be counter productive. The Probation recommendation for Count One is 120 months.  We concur in this request for Count One.


Trevon has never been in control of his life circumstances.   I ask the Court to consider, how did he get here? Who is the young man who stands before the Court? What made him who he is? What makes a human being?  See: What Makes You, You. Science News Today , Muhammad TuhinMarch 22, 2025July 14, 2025


"While biology plays a substantial role in shaping your identity, it's also undeniable that the world around you—your family, friends, culture, and society—has a profound impact on who you become. Human beings are not born in isolation; from the moment you are born, you interact with and are influenced by your environment. These interactions shape your beliefs, values, behaviors, and ultimately your sense of self.

As you grow older, peer interactions become increasingly important in shaping your identity. During adolescence, peer pressure and the desire to fit in can lead to significant changes in behavior, interests, and social identity. However, as individuals mature, they often begin to carve out their own identities distinct from the influences of their peer groups, building a sense of individuality."


"What makes you, you?" is not one with a simple answer. While your genes provide the biological foundation of who you are, it is the interplay between your genetics, brain activity,

memories, and the environments you inhabit that shapes your unique identity. Your biology, experiences, and personal choices converge to create the complex individual you are."

Trevon is the product of his physical and biological body and the painful environmental influences throughout his development. Trevon was born with cognitive disorders. Whether the deficits were genetic or caused by umbilical cord cutting off oxygen from his brain, he had problems from his birth onward. He presented with serious difficulties in school from a very young age. He had difficulties reading. He could not control his eyes or his body. He suffered from impulsivity. He could not remain in his seat at school.

Trevon was diagnosed at an early age with "behavior disorder" and granted an IEP. He was transferred from class to class--from school to school. The early interventions may have worked, but for the violence he encountered at age twelve, when he walked out his door and found the mangled body of his brother, Philip, just after his brother was murdered.

Trevon has never been treated for his PTSD, nor his unresolved grief. PTSD is often misdiagnosed as ADHD. Regardless of his diagnosis, as a result of his behavior disorder and his family limitations, he was sent away from D.C. to a school in Arizona for several years. Counsel was unable to obtain any treatment records from the school. Apparently. the separation from his mother added more trauma to an already distressed boy.

**PTSD**

Medical records from the DoC starting in 2019 address his mental health issues of PTSD. He was prescribed medication for his Mental Health problems. The medical records for this incarceration in 2024--make no mention of PTSD. There is no treatment, therapy nor medication in 2024 or 2025 although the problem still exists.

Incarcerating Trevon is double punishment. He already suffers from untreated PTSD and further incarceration has been shown to produce PTSD.

"Post-traumatic stress disorder, or PTSD, has been found by researchers to be more common in male inmates than in the general population. Using data collected from a survey, the researchers found that being incarcerated nearly doubles the risk that a man will suffer from this devastating condition." Promises Behavioral Health, Prisoners at Higher Risk for PTSD (Oct. 2021https://www.promisesbehavioralhealth.com/trauma-ptsd/prisoners-higher-risk-ptsd/

17

"African American men who had been incarcerated were two times as likely as those who had never been to prison to have PTSD. Thirteen percent of the men with PTSD had been in prison, while less than 8% who had never been incarcerated struggled with the disorder." Id. Annotated Bibliography for Federal Non-Capital Sentencing

"Understanding the connection between PTSD and incarceration is important for several reasons. Knowing that men in prison are at greater risk for the disorder provides experts and healthcare professionals a chance to intervene, prevent and treat prisoners. PTSD is a devastating and life-changing disorder when left untreated. It is associated with unemployment, suicide, domestic violence, assaults, substance abuse and other mental health issues. However, there are good and effective treatment options for PTSD, and if these treatments can be given to the most vulnerable populations, many people will have better outcomes." Id.

"Evidence has accumulated that young people in America are witnesses to considerable violence at home and in the community. This study is the first to examine the association between witnessing community violence and criminal behavior in a representative sample of young adults…. The results indicate that recent exposure to violence in the community along with a history of receiving traumatic news, direct victimizations in the community, recent life events, and associations with criminal peers increase the risk for young adult criminal offending." David Eitle & R. Jay Turner, *The Effects of Witnessing Violence, Traumatic Victimization, and Other Stressful Life Events. 39J. of Research in Crime &Delinquency 214 (2002)*

Understanding the role of a disabling disorder like ADHD and the disabling PTSD caused by the trauma in  young Trevon's life, do not excuse his conduct, but they do explain it. He is the product of his cognitive disorder and the environmental trauma he suffered in his home, in the community and on the steps of his house where he found his dead brother.

Recommendations of Dr. Flower

It is recommended that Mr. Palmer participate in evidence-based substance abuse treatment during any period of incarceration. He currently presents in the "pre-contemplative" stage of change regarding his substance issues, so optimally he should initially be placed in a treatment appropriate to that stage. (This optimally would be Motivational Interviewing, an evidence-based practice, but educational approaches are also used.) It is recommended that he continue

18

substance abuse treatment after his release to the community. Research has shown that treatment in the community has value beyond treatment provided in a controlled environment, and substance abstinence is associated with a lower risk of recidivism. It is recommended that his substance abstinence be monitored as a condition of his release, and that he supplement his treatment with regular attendance at peer-support recovery meetings in the community.

If available, it is recommended that Mr. Palmer engage in cognitive-behavioral therapy (CBT) focused on the patterns of thinking and behavior that have contributed to his past arrest, to decrease his risk of recidivism.

Although he does not currently appear to need mental health treatment per se, it is recommended that, in his substance abuse treatment, Mr. Palmer examine his traumatic experiences and how they may continue to contribute to his substance issues. Exploring his history of traumatic loss in treatment may also strengthen the therapeutic rapport and increase his engagement in treatment. Given the family history of depression and his own history of mood disturbance, he should continue to be monitored for future depressive symptoms.

**Conclusion**

We request the Court Sentence Trevon Palmer to 120 months for Count One.  We concur with the recommendation of United States Probation Officer Centanni that a downward variance to 120 months is appropriate. We request the Court consider the following basis for a downward variance.

We further request the Court consider the following factors in granting our request for a Concurrent Sentence in Count Two.

Based on his cognitive disorder  and untreated PTSD we are requesting a downward variance;

Based on the extreme trauma he suffered at age twelve, which has never been treated, we are requesting a downward variance;

Based on his opioid addiction, which has never been treated, we are requesting a downward variance;

Based on the inflation of his Criminal History score, we are requestion a downward variance;

Based on the America's failed "war on drugs" and the research in support thereof, we are requesting a downward variance;

Based on empirical evidence that proves a longer sentence is no better than a less harsh sentence to deter future crime by the defendant, are not a deterrent to future misconduct, we are requesting a downward variance.

We are requesting a downward variance to a sentence of 120 months for Count One. We are requesting a concurrent sentence of Five Years for Count Two.

During incarceration, we are requesting placement in an evidence based drug treatment program. We are asking that he be placed in a Bureau of Prisons facility where he can engage in cognitive behavior therapy; and we are requesting grief counseling if available during incarceration; and we are requesting treatment for PSTD if available during incarceration; and we are requesting placement at a facility where he can continue his education.

We further request drug abstinence treatment during supervised release. We request referral for ongoing cognitive behavior therapy. We request he participate in parenting groups. Finally, we pray the Court Order U.S. Probation to grant Trevon Palmer assistance to continue his education, the provision of vocational training, and assistance in job placement.

Respectfully submitted,

/hhs/

_____

H. Heather Shaner  #273276
Appointed by the Court for Trevon Palmer
1702 S Street N.W.
Washington, D.C. 20009
Tel. 202 265 8210
hhsesq@aol.com

20